**WO**                                                                                           MB(NN)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bharatkumar J. Kapadia, | No. 06-CV-01359-PCT-EHC |
| Plaintiff, | **ORDER** |
| vs. | |
| Edith Thompson; John Czernics; Paul Czernics; James Hatfield, James Czernics | |
| Defendants. | |

**I. Issues**

The issue before the Court is a dispute as to the identity of beneficiaries in a life insurance policy. On September 4, 2003, former plaintiff Protective Life Insurance Company ("Protective") issued a life insurance policy ("Policy"), number DT0173409, to Maria E. Hatfield ("Maria") in the amount of $100,000. After Maria's death on February 8, 2006, Plaintiff Bharatkumar J. Kapadia ("Kapadia"), asserting he was the sole beneficiary, and four defendants, children of Maria, submitted claims to Protective for the proceeds of the Policy as named beneficiaries when the policy was made. (See Dkt. 24, p. 2, Exhibits 4, 5).

Protective filed a Complaint for Interpleader. (Dkt. 1). After depositing the disputed funds with the Court, Protective was dismissed from this interpleader action and discharged from liability on December 4, 2006. (Dkt. 36). Kapadia, previously a defendant, by Court order was named the sole plaintiff in the case on July 23, 2007. (Dkt. 45).

There is no dispute that Maria's six children were originally named in the Policy as the beneficiaries. A form amending Maria's Policy, dated October 15, 2003, approximately six weeks after the original Policy was issued, lists the names of the four children, who are defendants in this case, as beneficiaries: Edith Thompson; John Czernics; James Czernics; and Paul Czernics. Two more children, non-parties in this case, are also listed as beneficiaries, Richard Bable and Mark Bable. The form shows James Czernics' name crossed out as a beneficiary and Kapadia's handwritten name substituted in its stead. (Dkt. 89, Exhibit 15). Maria allegedly completed and signed an amendment to her policy on November 24, 2003, designating Kapadia as the sole beneficiary under the Policy. (Dkt. 89, Exhibit 3).

Kapadia contends that he is the sole beneficiary of the policy. Kapadia bases his contention on the November 24, 2003 amendment to Maria's policy application. (Dkt. 89, Exhibit 4). Defendants allege they are the valid beneficiaries under the Policy, and that Kapadia forged Maria's signature on the beneficiary change form and/or induced Maria into naming him as the sole beneficiary. (Dkt. 89, Exhibits 22 and 25).

James Hatfield, the deceased's husband, never named as a beneficiary, claims half of the proceeds, "based on the insured's constructive fraud against James Hatfield."[1] (Dkt. 13, p. 2). Additionally, on June 29, 2006, James Hatfield received an assignment of James Czernics' claim to any Policy proceeds.[2] (See Dkt. 13, p. 2, Exhibit 1).

Pending before the Court are two motions for summary judgment. Plaintiff Kapadia filed a motion for summary judgment (Dkt. 66) with a supporting statement of facts (Dkt. 67). Defendant James Hatfield filed a response in opposition to Kapadia's motion (Dkt.82 ) and

---

[1] The Court construes this basis as "[Kapadia's] constructive fraud . . ." rather than insured Maria's constructive fraud against her husband.

[2] A Clerk's Entry of Default against Defendant James Czernics was entered on August 30, 2006. (Dkt. 23). The issue of James Czernics' assignment of his share of the Policy proceeds to James Hatfield is not before the Court, and thus, will not be addressed.

- 2 -

1 a corresponding statement of facts (Dkt. 83). *Pro se* Defendant Paul Czernics also filed a
2 motion for summary judgment (Dkt. 88) and statement of facts in support of his motion (Dkt.
3 89). Kapadia filed a response (Dkt. 93) and a separate statement of facts in support of his
4 response (Dkt. 94). Defendant James Hatfield also filed a response in opposition to Paul
5 Czernics' motion for summary judgment (Dkt. 95).

6 **II. Summary Judgment Standard**

7 A court must grant summary judgment "if the pleadings, the discovery and disclosure
8 materials on file, and any affidavits show that there is no genuine issue as to any material fact
9 and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©; see also
10 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice,
11 the moving party bears the initial responsibility of presenting the basis for its motion and
12 identifying those portions of the record, together with affidavits, that it believes demonstrate
13 the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Devereaux v.
14 Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

15 If the moving party meets its burden with a properly supported motion, the burden then
16 shifts to the opposing party to present specific facts that show there is a genuine issue for
17 trial. Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995);
18 see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The opposing party need not
19 establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed
20 factual dispute be shown to require a jury or judge to resolve the parties' differing versions
21 of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89
22 (1968). Conclusory allegations, unsupported by factual material, are insufficient to defeat
23 a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).
24 Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate
25 specific facts that show there is a genuine issue for trial. Anderson, 477 U.S. at 249;
26 Devereaux, 263 F.3d at 1076.

27
28
- 3 -

1    In assessing whether a party has met its burden, the court views the evidence in the light
2 most favorable to the non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056
3 (9th Cir. 1995). If the evidence of the non-moving party is merely colorable or is not
4 significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-50.

5 **III. Motions for Summary Judgment**

6    **A. Kapadia's motion for summary judgment**

7    Kapadia, represented by counsel, offers four affidavits in support of his motion: two from
8 friends of the deceased; one from Kapadia himself; and one from a licensed notary who
9 notarized the deceased's signature on a document naming Kapadia as the beneficiary of the
10 Policy. With the exception of the licensed notary, who swore that the deceased signed the
11 relevant document voluntarily, the affiants assert that the deceased did not want her children
12 to receive Policy benefits because she was disillusioned with them for their lack of attention,
13 and instead chose Kapadia to be the sole beneficiary. (See Dkt. 66, Exhibits 1-4). Kapadia
14 also claims that he paid all of the premiums once he was named the Policy beneficiary, that
15 Maria was estranged from her husband, James Hatfield, and her children, and that Kapadia
16 took care of Maria, treating her like a sister. (Dkt. 66, Exhibit 4). Lastly, Kapadia submits
17 a court order of protection filed by Maria against her husband, James Hatfield, on October
18 12, 2005, less than four months before her death. (Dkt. 66, Exhibit 5).

19    James Hatfield, represented by counsel, acknowledges he agreed to and witnessed the
20 original naming of the six children as beneficiaries in the Policy; he does not dispute that he
21 was never named a beneficiary. (See Dkt. 82, p. 3). He argues in his response that because
22 the children are no longer named as the beneficiaries, he is claiming his half of the Policy
23 proceeds; the Policy was acquired during the marriage and is therefore community property.
24 (See Dkt. 82). James Hatfield also contends that the marital community paid most of the
25 insurance premiums and that Kapadia has only produced copies of three premium payments,

- 4 -

1  none of which show they were made by Kapadia.[3] (See Dkt. 82, p. 3).  Lastly, in his sworn
2  affidavit, James Hatfield reports he suffered a stroke in September 2005, and in light of his
3  wife's failing health, he moved into an assisted living facility.  His placement in assisted
4  living occurred one month *before* the order of protection allegedly filed by Maria against her
5  husband. (See  Dkt. 83, Exhibit A and Dkt. 67, Exhibit 5).

6  These are material issues going to who is a lawfully named beneficiary.

7  James Hatfield did not file a motion for summary judgment.  Rather, in the last sentence
8  of his response to Kapadia's motion for summary judgment, he "requests the Court grant
9  summary judgment in his favor concerning his community property interest in the proceeds
10 of the life insurance policy, and award him 50 percent of the proceeds of the life insurance
11 policy." (Dkt. 82, p. 6).  The other *pro se* defendants did not file a response to Kapadia's
12 motion.[4]

13 **B.  Paul Czernics' motion for summary judgment**

14 Paul Czernics ("Czernics"), proceeding pro se, filed his own motion for summary
15 judgment.  He argues that he and the other defendants claim, *inter alia*, that "Maria Hatfield
16 was financially exploited before and after she passed away" by Kapadia. (Dkt. 88, p. 1). The
17 children argue their mother was coerced and/or deceived into naming Kapadia as the
18 beneficiary of the Policy.  Czernics denies that Maria was estranged from her children, and
19 supports his claim with several affidavits from Maria's children and a grandchild. (Dkt. 89,
20 Exhibits 8, 17, 20, 21, and 25).

21 Kapadia's response to Czernics' motion for summary judgment does not comply with the
22 Local Rules: "Any party opposing a motion for summary judgment shall file a
23 statement . . . setting forth . . . a *correspondingly numbered paragraph indicating whether*

---

[3] The payments were made by Travelers Express Money Grams. (Dkt. 83-2, Exhibit B)

[4] Some leeway is given to *pro se* parties and the failure to file a response is mitigated by Paul Czernics' cross motion for summary judgment. See Note 4, *infra*.

- 5 -

1  *the party disputes the statement of fact set forth in that paragraph* and a reference to the
2  specific admissible portion of the record supporting the party's position if the fact is
3  disputed." LRCiv. 56.1(b) (2007) (emphasis added).[5]  Kapadia fails to do so. (See Dkts.94
4  and 89). In fact, Kapadia's statement of facts in support of his response is *identical* to that
5  he submitted in support of his own motion for summary judgment and it does not correspond
6  to Czernics' statement of facts. (See Dkts. 67 and 94).  Moreover, in Kapadia's
7  memorandum, he does not address a majority of Czernics' contentions,[6] nor does he provide
8  supporting documents in his response other than those he already submitted in his own
9  motion for summary judgment.

10  Additionally, "[e]ach numbered paragraph of the statement of facts set forth in the moving
11  party's separate statement of facts shall, unless otherwise ordered, *be deemed admitted* for
12  purposes of the motion for summary judgment *if not specifically controverted by a*
13  *correspondingly numbered paragraph* in the opposing party's separate statement of facts."
14  LRCiv. 56.1(b) (2007) (emphases added).  Thus, the Court has the discretion to adopt

---

[5] See Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment[;]" it is not a district court's task to "scour the record in search of a genuine issue of triable fact") (quoting Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

[6] Czernics' format does not entirely adhere to the Local Rules, either. However, the Ninth Circuit upholds a "policy of liberal construction in favor of pro se litigants." Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998).  Litigants have a statutory right to self-representation in civil matters, see 28 U.S.C. § 1654, and are entitled to meaningful access to the courts. Rand, 154 F.3d at 957 (citing Bounds v. Smith, 430 U.S. 817, 823, 97 S.Ct. 1491 (1977)); Wolff v. McDonnell, 418 U.S. 539, 579, 94 S.Ct. 2963 (1974); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747 (1969); Hatfield v. Bailleaux, 290 F.2d 632, 637 (9th Cir. 1961). Consequently, the Court tolerates informalities from civil pro se litigants like Czernics. In this case, Czernics attached 25 exhibits to the statement of facts (Dkt. 89), and in his motion for summary judgment, a separate filing, addressed each one in a paragraph correspondingly numbered to each exhibit in his motion (Dkt. 88, pp. 3-6). It would have been a simple task for Kapadia in his response to address Czernics' factual statements and corresponding exhibits.

1 Czernics' statement of facts in its entirety.  Nonetheless, the Court will consider Kapadia's

2 arguments that address any of Czernics' facts from Kapadia's memorandum of points and

3 authorities and will consider them along with Czernics' statement of facts for purposes of this

4 motion.

5 The Court notes several, but not all, material facts presented in Czernics' motion, and

6 indicates whether Kapadia did or did not respond:

7 1. A document amending Maria's Policy, dated October 15, 2003, approximately six weeks after the original Policy was issued, shows that James Czernics' name was crossed out as a beneficiary and Kapadia's handwritten name was substituted in its stead. (Dkt. 89, Exhibit 2).  Kapadia does not respond to this exhibit.

2.  When Protective discovered that the total proportionate shares listed for each beneficiary exceeded 100 percent, it sent Maria a letter on October 23, 2003, requesting clarification. The same letter was returned to Protective on which was a handwritten "dramatic change," according to Czernics (Dkt. 88, p. 7), indicating Kapadia was the sole beneficiary, excluding all of the children listed in the amendment of October 15, 2003, with Maria's signature placed vertically on the margin of the page.[7] (See Dkts. 88 ¶ 3 and 89, Exhibit 3).  Kapadia does not respond to this exhibit.

3. Another form allegedly amending Maria's Policy, dated November 24, 2003, was sent to Protective designating Kapadia, described as her "Significant Other," as the sole beneficiary.  Kapadia was the sole witness to the signing of the document. (Dkt. 89, Exhibit 4).  Kapadia relies on this in his own motion and in his response.

4. In Kapadia's sworn statement, he alleges that soon after the Policy was issued, Maria became estranged from her children; she began experiencing financial difficulties; Kapadia started helping her financially for various expenses, including paying for the life insurance premiums; and Maria decided to make him sole beneficiary.  Czernics questions how this all could have come about; it purportedly occurred within one month, between October 2003, when five of Maria's six children were still named as beneficiaries, and November 2003, when Kapadia became the sole beneficiary of the Policy. (See Dkt 88, p. 13, Dkt. 89, and Dkt. 66, Exhibit 4).  Kapadia does not respond to Czernics' contentions.

5. A notarized document, dated December 23, 2005, and addressed "TO WHOM IT MAY CONCERN" again designates Kapadia as the sole beneficiary of the Policy and expressly excludes family members. (Dkt. 89, Exhibit 5). Kapadia relies on this in his own motion. On the same date, a medical power of attorney "with mental health authority" was notarized, designating Kapadia as Maria's agent. (Dkt. 89, Exhibit 6).

6. Also on December 23, 2005, in a notarized document, which the Court construes as a codicil, Maria designates her Cadillac to Kapadia, and her "gold Chevrolet" to her son Richard Bable. (Dkt. 89, Exhibit 7).  According to Czernics, Maria owned a champagne

---

[7] The handwritten changes and Maria's signature are not dated.

1	Dodge Neon, not a gold Chevrolet. (Dkt. 88, ¶ 4). Kapadia responds by explaining that the car given to him was not worth more than the cost of the needed repairs. Kapadia does not address the discrepancy pointed out by Czernics.

7. James Czernics' affidavit (Dkt. 89, Exhibit 25) describes in detail how he had made arrangements to pick up his mother when she was discharged from the hospital after an operation, but discovered she had already been discharged and had gone home. His attempts to call her at her home phone or her cell phone were unsuccessful; someone else always answered. When he went to visit her, he found her mother in a deep sleep and several strangers in Maria's apartment packing up her possession. When he questioned them, a woman attempted to pass herself off as Maria's sister. His subsequent and unsuccessful attempts to visit his mother were unsuccessful. Shortly thereafter, Kapadia called the police and reported him for trespassing. Again, attempts to call his mother were unsuccessful - she was either not at home or resting. He discovered that the rest of the family also could not get through to Maria. Czernics submitted Edith Thompson's telephone records reflecting numerous attempts to contact her mother. (See Dkt. 89, Exhibit 18).

When his mother was taken to hospice care, James Czernics' visited her and found Kapadia in her room. Maria told her son that Kapadia had her savings bonds, which James Czernics took away from him. She announced that Kapadia had her jewelry and she wanted it returned. Kapadia quickly left. Soon thereafter, a hospice volunteer arrived at the room, indicating she had been summoned to notarize a document. Maria explained to her son that Kapadia wanted her to grant power of attorney to him. The licensed notary added that this had been Kapadia's second attempt, the first being on January 22, 2006.

In the notary's journal entry, dated January 22, 2006, involving Kapadia, the notary wrote that "a gentleman named 'Bob'[8] was *insisting* she sign POA [Power of Attorney] to him," and that it did not appear Maria wanted to do so. (Dkt. 89, Exhibit 22) (emphasis added). The notary's journal also reflects that on January 30, 2006, Maria named her oldest son, James Czernics, as her "Attorney-in-Fact." (See Dkt. 88, p. 11 and Dkt. 89, Exhibit 25). A copy of the POA was furnished by Czernics. (Dkt. 89, Exhibit 10). Kapadia does not respond to any of these exhibits, except to argue that it proves Maria was always of sound mind, having asserted herself in this situation.

8. An affidavit written by Defendant Edith Thompson ("Thompson") and dated November 19, 2007, asserts her mother always intended to leave the Policy Proceeds to her children. Thompson states she was never estranged from her mother and visited Maria twice before she died, in December of 2005 and January 2006. An American Airlines receipt for the December trip from Chicago to Tucson and back on December 8 to December 13, 2005, has been filed. Maria's granddaughter, Alicia McKinney ("McKinney"), also visited her in the hospital, and in an affidavit the granddaughter describes her close relationship with Maria. (See Dkt. 89, Exhibit 21). During the January 2006 visit, when Maria was seriously ill, Thompson discovered that her mother was in a locked motel room and she had to find Kapadia, the owner of the motel, to let her in. Thompson found her mother in a "filthy" state without a caretaker and moved her to hospice care before she returned home. Thompson said her mother was nearly incoherent and likely over-medicated. When questioned, Kapadia informed Thompson that he could not care for Maria and

---

[8] There is no dispute that Kapadia goes by the name of "Bob."

- 8 -

operate his motel at the same time. Thompson swears in her affidavit that she has never met her mother's "so called 'friends,'" who submitted affidavits on Kapadia's behalf, nor did she meet them during her visits with Maria. In contrast, Vicki Henry swore, in her affidavit in support of Kapadia, that she had known Maria since 1991 and had met five of her six children over the years.[9] A week before her death, son James Czernics took Maria to his home in Taylor, Arizona, where she died. (Dkt. 89, Exhibit 8).

Kapadia ignores Thompson's, Czernics', James Czernics' and Kinney's affidavits; rather, he obliquely refers to Czernics' "allu[sions]" to claims of regular contact between Maria and her children. (See Dkt. 93, p. 6). Kapadia instead argues that "*no evidence* to that fact has been presented." (Dkt. 93, p. 6) (emphasis added). Kapadia solely relies on his own and two additional affidavits to support his contention that Maria and her family were estranged and refers to it as "substantial evidence." (See Dkt.66, p. 2).

9. Several police department incident reports reflect James Czernics' unsuccessful attempts, with police assistance, both before and after Maria's death, to honor his mother's wishes and retrieve all of her possessions from Kapadia at his motel (Dkt. 89, Exhibit 11). Kapadia incorrectly contends that the "various police notations provided by Defendant do not mention any contact the police had with Decedent, rather all with her son[]" (Dkt. 93. P. 6), even though Czernics argues that his mother did indeed speak with a police officer to confirm she wanted her property returned to her. (Dkt. 88, p. 12). The following summarizes the police reports:

**01/14/2006** - James Czernics reported he had been unable to contact Maria and requested a welfare check. A police officer responded and reported back that Kapadia had been contacted and Maria was all right and sleeping.

**02/02/2006** - James Czernics reported that Kapadia had taken several of Maria's things. ***Officer Baca "spoke with Maria Hatfield and she requested that her property be returned."*** Another report on the same day indicates that "the manager is refusing to release the property." Later the same day, the police sent James Czernics to see a judge about how to retrieve the property, but the judge told him it was a police matter, sending him back to the police.

**02/10/2006** - James Czernics requested standby assistance while he picked up Maria's property.

**02/13/2006** - John Czernics called police about his mother's missing property.

0**2/16/2006** - James Czernics again asked for assistance so that he could pick up his mother's belongings.

10. An "Authorization to Cremate" signed by Maria and her daughter, Thompson, dated in May 2003, reports Maria wished to be cremated upon her death. (Dkt. 89, Exhibit

---

[9] Also, Vicki Henry indicated she was aware of a tense relationship between Maria and her children. She added that Maria wanted her to witness telephone conversations between them, putting her children on speaker phone so that Vicki Henry could hear the conversations, which, according to her, were greatly upsetting to Maria. (Dkt. 94, Exhibit 1, ¶ 10).

- 9 -

1).  An "Authority to Cremate" dated February 8, 2006, signed by her son, James Czernics, authorized the crematory to proceed with cremation (Dkt. 89, Exhibit 15). Furthermore, Czernics' furnished a copy of a cashier's check for $1,380.20, purchased by Maria Hatfield, to pay Silver Creek Mortuary. There is no documentary evidence to support Kapadia's claim that he paid for her burial plot and funeral expenses. (See Dkt. 66, Exhibit 4 and Dkt. 89, Exhibit 16).  Kapadia does not respond to these exhibits.

11. Kapadia has produced copies of three premium payments, none of which show they were made by Kapadia. (See Dkt. 82, Exhibit B).  Czernics, on the other hand, produced Maria's Travelers Express Money Grams, used to pay the insurance premium payments from July through December 2003.[10] (Dkt. 89, Exhibit 14). Kapadia does not respond to this exhibit.

12. Maria's checking account, with a $5,332.42 balance, payable to "cash," was cashed and the account closed "for reasons unknown." The name of the person cashing the check does not show on the check. This occurred during the period when Maria "was isolated under Kapadia's care." (Dkt. 88, p. 4, ¶ 9; See Dkt. 89, Exhibit 9). Kapadia does not respond to these exhibits.

13. Maria had always been financially able but died penniless. (See Dkt. 89, p.3, ¶¶ 13, 14, Exhibits 9 and 19).  Kapadia does not respond to this claim or supporting exhibits.

Czernics' arguments and evidence are considerable. He reports a series of events, showing the steps Kapadia allegedly took to take advantage of Maria and how he fraudulently induced her to designate him as the sole beneficiary under her Policy. Kapadia failed to supplement his evidence or refute many of Czernics' claims when he filed a response to Czernics' motion for summary judgment. Instead, he submitted the same exhibits he had attached to his own motion for summary judgment. Nevertheless, summary judgment should be granted only if the record demonstrates that "there is no genuine issue as to any material fact." See Fed. R. Civ. P. 56(c). Czernics' motion for summary judgment fails to identify an absence of a genuine issue of material fact. Czernics' supporting affidavits, James Hatfield's affidavit, and Kapadia's supporting affidavits present "differing versions of the truth" that can only be resolved at trial. See First Nat'l Bank of Arizona, 391 U.S. at 288-89 (1968).

---

[10] Maria's reported practice was to pay by money orders.

Although this case will be tried by the court, rather than a jury, the Court cannot decide the factual issues presented in the parties' motions, unless "the parties agree that all the underlying material facts are reflected in the written record" and "the credibility of the witnesses' statements or testimony is not at issue." See Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1038 n. 6 (9th Cir. 2000) (citing Starsky v. Williams, 512 F.2d 109, 111 (9th Cr. 1975). Here, there is no stipulation or indication that the record is complete. Further, because affidavits submitted by Kapadia, James Hatfield, and Paul Czernics contradict each other, there are clear issues of credibility. If the court made a decision on the evidence as presented at this time it would arguably engage in improper fact-finding. See id.

### IV. Conclusion

Because the parties have filed cross-motions for summary judgment, the Court has considered all evidence properly submitted by the parties in support of and in opposition to both motions for summary judgment. See Fair Housing Council of Riverside County, Inc. v Riverside Two, 249 F.3d 1132, 1135 (9th Cir. 2001). Considering both motions and all corresponding responses, the Court finds that there are genuine issues of material fact as to the identity of beneficiaries of Maria Hatfield's life insurance policy.

Accordingly,

**IT IS ORDERED** that Plaintiff Kapadia's motion for summary judgment (Dkt. 66) is **denied**.

**IT IS FURTHER ORDERED** that Defendant Czernics' motion for summary judgment (Dkt. 88) is **denied**.

**IT IS FURTHER ORDERED** that Defendant James Hatfield's request for summary judgment is **denied**.

**IT IS FURTHER ORDERED** that a Status Conference will be held on **October 9, 2008**, at **10:00 A.M.** Arizona time. The parties should be prepared to discuss a date for trial.

**IT IS FURTHER ORDERED** that out-of-state, unrepresented Defendants may appear at the Status Conference telephonically by making prior arrangements with chambers at **602-322-7530**, by **Tuesday**, **October 7, 2008**.

DATED this 24th day of September, 2008.

_Earl H. Carroll_
Earl H. Carroll
United States District Judge